# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case Nos. 1:26-cr-19-LMB; 1:26-cr-20-LMB |
| D'MONI ANTHONY MOTEN | |
| and | **Sentencing**: May 5, 2026 |
| DONTAVIOUS WHITAKER | |
| *Defendants*. | |

**GOVERNMENT'S DECLARATION IN SUPPORT OF SENTENCING**

I, Patrick Maxwell, herein declare as follows:

## I.    Introduction

1.   I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), and I have been so employed since July 2024.  I have been a sworn law enforcement officer in Arlington County, Virginia since 2007.  I am currently assigned to the Organized Crime Section – Drug Enforcement Vice Unit of the Arlington County Police Department.  I am currently deputized with the Drug Enforcement Administration (DEA) Northern Virginia Mass Transportation Initiative (NVMTI).  I have investigated hundreds of criminal offenses and received convictions from those investigations in the Courts of Arlington County, Virginia, and Federal Courts in the Eastern District of Virginia.  I have previously been certified as an Expert Witness in the General District Courts of Arlington County, Virginia regarding narcotics possession and distribution.  I have received specialized training in narcotics recognition, interdiction, and prosecutions, cell phone investigative techniques, cyber investigations, and extensive other training from various police academies, the DEA, and other federal agencies.  During my employment with the Arlington

1

County Police Department and tenure with as a Task Force Officer, I have gained knowledge in the use of various investigative techniques, including but not limited to: the utilization of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants. In addition, I am familiar with the search, examination, and exploitation of data obtained from cellular phones, computers, and internet-service and communications providers, including social media, electronic mail, and online / web-based messaging applications.

2.  As a result of my training and experience, I am familiar with the manner in which controlled substances are used and distributed.  I have also become familiar with the methodology used in narcotics trafficking operations, as well as the unique trafficking patterns and language employed by drug dealers.  As a TFO, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances.  Based on my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers of controlled dangerous substances.

3.  I am the primary Case Agent on DEA's criminal investigation into the drug trafficking organization ("DTO") of Dontavious Whitaker ("Whitaker"), D'Moni Moten ("Moten"), Edward Wright III ("Wright"), and other unindicted coconspirators.  Amongst other narcotics distribution, this DTO was involved in the large-scale trafficking of counterfeit pressed pills containing fentanyl (hereinafter, "fentanyl pills").  I submit this declaration is made in connection with Whitaker and

Moten's sentencings and to provide the Court with evidence related to drug quantity calculations, Whitaker's role in the drug distribution conspiracy, and the financial investigation of the DTO.

4.  My ability to provide an informed and accurate assessment of this matter is based on my personal knowledge, my review of documents and other evidence obtained during the investigation, and my conversations with law enforcement officers and other individuals.

## II.    Drug Quantity Based on Electronic Evidence

5.  As detailed in the signed statements of facts which accompanied the plea agreements entered by Whitaker and Moten, evidence of fentanyl pill quantity negotiated and purchased was located on electronic devices and/or social media accounts associated with DTO members.  As referenced in paragraph 16 of the statement of facts for both defendants, Whitaker had significant communications with unindicted coconspirator 2 ("UCC-2") regarding UCC-2 supplying Whitaker and his co-conspirators with fentanyl pills.  Moreover, as further stated in paragraph 16 of the statement of facts for both defendants, communications between Whitaker and Moten indicate that Moten was aware of UCC-2 as a source of supply.  Quantities purchased from UCC-2 were typically between 20,000-80,000 fentanyl pills, while amounts negotiated were even higher. Based on my review of communications between Whitaker and UCC-2, the DTO purchased and/or negotiated the purchase of over 410,000 fentanyl pills from UCC-2 during the time period of March through July 2025.  Based on my training and experience, I know fentanyl pills typically weigh approximately 0.1 grams.  I have confirmed this estimate through my review of lab analysis reports completed by the DEA Lab in this case.[1]    Therefore, 410,000 pills would total

---

[1] For example, the 1,860 fentanyl pills seized from the Range Rover operated by Whitaker on February 19, 2025 weighed 203.76 grams, which results in 0.109 grams per pill.  Similarly, 2,980 of the carfentanil pills seized from the DURANGO on November 12, 2025 weighed 319 grams, which results in 0.107 grams per pill.  The majority of the lab analysis reports I have viewed in this case, as well as other fentanyl pill distribution cases, confirm this estimate.

approximately 41 kilograms of pills containing fentanyl. A demonstrative chart is attached to this Declaration as Exhibit A, and incorporated by reference.

6. Moreover, review of electronic evidence has confirmed that the DTO had sources of supply for bulk fentanyl pills besides UCC-2. For example, during a negotiation from January 23, 2024 with the fentanyl pill distributor discussed in paragraph 5 of the signed statement of facts, Whitaker stated, "4 all darks don't give me them wild looking joints yours best packs can't f*** my hits up slime." Based on my training and experience, this message represents Whitaker negotiating for 4 "k packs," or 4,000 fentanyl pills, and requesting a specific shade of blue he believed indicated better quality.

## III. Direction and Management of Coconspirators (Whitaker)

7. Review of Whitaker's communications has indicated that he has directed other co-conspirators during the course of and in furtherance of the conspiracy. For example, on May 8, 2025, Whitaker told UCC-2: "I had my worker counting them" in reference to pill counts. Additionally, this investigation revealed numerous instances of Whitaker directing or utilizing UCC-1 to further goals of the conspiracy and avoid law enforcement detection. For example, review of messages between Whitaker and UCC-1 revealed that Whitaker requested UCC-1 purchase the Mercedes and instructed UCC-1 to register the Mercedes in UCC-1's name. Additionally, when UCC-1 was interviewed by law enforcement on November 12, 2025, UCC-1 stated that UCC-1 did "car stuff" for Whitaker, did the paperwork for the purchase of the Mercedes, and used Whitaker's cash to purchase the Mercedes. Whitaker also requested that UCC-1 rent the Durango for his use. In addition to the Mercedes and Durango, investigators learned that the Range Rover used by Whitaker on February 19, 2025, was also registered in UCC-1's name. Furthermore, investigators discovered that the internet accounts at a residence used by the

conspiracy[2] ("KINGS HIGHWAY RESIDENCE") were held in UCC-1's name.  Moreover, UCC-1 made several rent payments via Apple Cash for both the WOODSIDE and FAIRFIELD RESIDENCES.[3]  Finally, as further discussed below regarding Wright, Whitaker funneled drug proceeds through UCC-1 and Wright.[4]  Examples of Whitaker directing UCC-1 as to money movement, apartment rentals, and rent payments are depicted in the below chart:

| Date/Time | UCC-1 | WHITAKER |
|---|---|---|
| 3/31/2025  8:21:41 PM(UTC+0) | | Cash out 800 put it in. My account |
| 3/31/2025  8:29:05 PM(UTC+0) | Liked "Cash out 800 put it in. My account " | |
| | | |
| 12/18/2024  9:55:09 PM(UTC+0) | | Check your cash app |
| 12/18/2024  9:55:21 PM(UTC+0) | | And my folks send that other 500 on Apple Pay |
| 12/18/2024  9:58:16 PM(UTC+0) | What          the          name On cashapp | |

---

[2] This residence was rented using fake identification documents.

[3] On April and May 6, 2025, UCC-1 made payments for the WOODSIDE RESIDENCE of $2,516.03 and $2,354.81, respectively.  From April through October 2025, UCC-1 made 7 monthly payments for the FAIRFIELD RESIDENCE ranging from approximately $2,000 to $2,300/month.

[4] Additionally, review of bank records for Whitaker and UCC-1 indicate significant funds passed between their two bank accounts with Navy Federal Credit Union ("NFCU").  For example, on September 29, 2025, UCC-1 transferred over $13,000 to Whitaker over the course of 12 transactions.  On the same date, Whitaker transferred approximately $9,000 back to UCC-1's account and made a $4,000 cash withdrawal at a NFCU branch.

| | | |
|---|---|---|
| 12/18/2024 10:00:22 PM(UTC+0) | | Idk |
| 12/18/2024 10:00:32 PM(UTC+0) | | Check your cash app post to be like 600 |
| | | |
| 3/30/2025  3:25:16 PM(UTC+0) | | You get the address for the car |
| 3/30/2025  3:25:53 PM(UTC+0) | | We need to go do that asap I left endless shit in there im trying get out |
| | | |
| 6/10/2024  11:37:04 PM(UTC+0) | | I really need this town house and a new trap before this month over |
| 6/10/2024  11:37:25 PM(UTC+0) | Ard I'm trying !!!!!!! | |
| 6/10/2024  11:37:42 PM(UTC+0) | | Na fr I kno thank you 🙏 |
| 6/10/2024  11:38:08 PM(UTC+0) | You don't appreciate me fr but it cool, you welcome | |
| | | |
| 6/24/2024  7:07:42 PM(UTC+0) | | I forgot to stop and look at some apartments names but ima do it when I go back home |
| 6/24/2024  7:07:56 PM(UTC+0) | Yea plz do when you can I've been waiting | |
| 6/24/2024  7:09:49 PM(UTC+0) | | I got you butbut wyd |
| 6/24/2024  7:10:03 PM(UTC+0) | | The rent post yet at the trap |

6

8.    Similarly, messages located on Wright's phone reveal that Whitaker directed Wright regarding aspects of the conspiracy and provided Wright with narcotics which Wright redistributed.  For example, on May 18, 2025, Whitaker sent Wright a message stating, "Count them packs for me slims how many."[5]  As stated above, "pack" is drug slang for "k-pack"—a term representing a quantity of 1,000 fentanyl pills.  Additionally, on July 24, 2025, Wright told Whitaker he, "just got a play . . . he want some though just probably not that many."  In response, Whitaker directed Wright to, "Tell em we can do 23 for 20 you take that 3k."[6]  Moreover, on October 18, 2025, Wright told Whitaker, "I got your money too ima hold it to you tell me what to do with it I need a zip and another 100 ima call you before you pop out so you wont forget."  Similarly, on November 6, 2025, Whitaker sent Wright a message stating, "Ima leave the 100 count in the spot I don't got the weed yet waiting on cuz." Based on my training, experience, and knowledge of this investigation, the "100" references in these messages relate to quantities of fentanyl pills, particularly as the October message separately refers to a "zip" and the November message explicitly names another substance (marijuana) unconnected to the "100 count."

9.    Further messages indicate that Whitaker regularly directed Wright to receive payments for drug purchases via mobile payment applications.[7]  These messages also reveal that Whitaker directed Wright to send payments to UCC-1.  For instance, on November 2, 2025, Wright told

---

[5] *See* Exhibit B, pg. 140.

[6] This and subsequent communications are located in Exhibit C unless otherwise noted.  *See* Ex. C, pgs. 247-249 for this conversation.

[7] *See* Ex. C.

Whitaker, "Bout to send sis[8] $260 and I got $40 on cash for you from that play."[9]  Following this message, on the same day, examination of the Apple Cash transfers within Wright's phone revealed that Wright sent $260 to UCC-1's Apple Cash account.  In another message, sent from Wright to Whitaker on September 29, 2025, Wright told Whitaker, "Aye I sent sis 40 on the app . . ." As shown in the below chart, numerous communications from November 2025 depict Wright transferring money on Whitaker's behalf, typically for transactions in which Wright does not appear to be involved.[10]

| Date | WHITAKER | WRIGHT |
|---|---|---|
| 11/1/2025 | My man send that 300 | |
| 11/1/2025 | | No |
| 11/1/2025 | Bet lmk when sum money cum to your phone | |
| 11/1/2025 | | He sent it |
| 11/1/2025 | | Where you want it to go at |
| | | |
| 11/4/2025 | Send that 1100 to [first name of UCC-1] | |
| 11/4/2025 | | Nobody sent me nothing Brody |
| 11/4/2025 | You refresh it | |
| 11/4/2025 | | Yes bro |
| 11/4/2025 | 1050 bout come | |
| 11/4/2025 | | Bet |
| 11/4/2025 | Send it to [first name of UCC-1] rq | |
| 11/4/2025 | | I did bro |
| | | |
| 11/6/2025 | Send that 770 ok cash to my bitch for me | |
| 11/6/2025 | You send that shit? | |
| 11/6/2025 | | Yea |

---

[8] UCC-1's phone number is saved in Wright's phone under the contact name of "Sis."  Wright frequently refers to UCC-1 as "sis" in his messages with Whitaker.

[9] "Play" is a slang term referring to a drug transaction.  *See* Ex. C, pg. 416.

[10] *See* Ex. C, pgs. 413-15; 420-27; 428-29.

10. In addition to directives to send payments/funds to UCC-1, Whitaker also directed Wright to send funds to other individuals on his behalf.  Some examples of such communications are depicted in the below chart:[11]

| Date | WHITAKER | WRIGHT |
|---|---|---|
| 3/18/2025 | +1 (202) 210- 5834 | |
| 3/18/2025 | Say from Doe | |
| 3/18/2025 | | Apple Pay |
| 3/18/2025 | Apple Pay | |
| 3/18/2025 | | Ard[12] |
| | | |
| 4/29/2025 | Send moe 25 say from doe | |
| 4/29/2025 | Apple Pay | |
| 4/29/2025 | | Bet |
| | | |
| 9/5/2025 | [Phone Number ending in -3358] | |
| 9/5/2025 | Send 120 to this number for Doe | |
| 9/5/2025 | | What cashapp |
| 9/5/2025 | Apple Pay | |
| 9/5/2025 | | Bet |
| 9/5/2025 | Say from doe | |

11. Additionally, in numerous conversations with one of his customers—unindicted coconspirator 3 ("UCC-3"), Wright repeatedly refers to another individual who has decision-making power over the transactions.[13]  As explained herein, that individual appears to be Whitaker. For example, on August 19, 2025, Wright asked UCC-3, "You trying do it today my man ready . . . tomorrow?"  The next day, on August 20, 2025, UCC-3 and Wright arranged a drug transaction.

---

[11] *See* Ex. C, pgs. 53-54; 122; 289-91.

[12] Slang for "alright."

[13] *See* Exhibit D, pg. 10-14, 22-25, and 33-44.

Similarly, during a conversation on September 9, 2025, Wright used the word "we," and made numerous references to another person—"my man," "he"—who had decision-making power over pricing, logistics, and willingness to trade pills (*i.e.* "he said he can't do that bro . . . Look my man said he not trying to trade . . ."). During this conversation, UCC-3 complained about the quality of "4" items that he received from Wright (*i.e.*, 4 "k packs"). Wright ultimately told UCC-3 that "we" can "swap 2." Notably, three days prior to this conversation, following the apparent transaction for the four "k packs," UCC-3 sent Wright $5,100 via Apple Cash. An hour later, Wright transferred $4,400 to UCC-1 via Apple Cash.[14]

12. Review of Whitaker's phone extractions revealed that Whitaker also communicated with UCC-3, although those communications often appear facilitated by Wright. For example, on August 8, 2025, Wright tells UCC-3 to "Call me." Later that day, calls logs on one of Whitaker's phones show that a three-way call occurred between Whitaker, Wright, and UCC-3. It should be noted that this call occurred a day after another apparent drug transaction on August 7th between Wright and UCC-3 and two Apple Cash payments totaling $4500 from UCC-3 to Wright. Also on August 7th, Wright sent approximately $1,000 via Apple Cash to UCC-1. During October 2025, call logs reflect several calls between Whitaker and UCC-3, two of which are three-way calls with Wright. Based on the context of the aforementioned conversations, the payments from Wright to UCC-1 that immediately follow UCC-3's payments to Wright on August 7th and September 5th, the numerous three-way calls between Wright, Whitaker, and UCC-3, the fact that Whitaker regularly

---

[14] 4,000 fentanyl pills (*i.e.*, four "k packs") at $5,100 results in a price of approximately $1.28 per pill. This pricing is consistent with drug redistributors, like UCC-3, who purchase fentanyl pills in moderate bulk quantities like 4,000 pills, but is higher than pricing for high-level redistributors like Whitaker, who purchased tens of thousands of pills at $0.60-$1.00 per pill. Wright's transfer of $4,400 to UCC-1 is likely his payment for the 4,000 pills (which he received at a price of $1.10/per pill), which he then sold for a profit of $700 through his sale to UCC-3.

supplied Wright with pills, and Whitaker's position of authority over Wright within the DTO, I believe that Wright was referring to Whitaker in these conversations with UCC-3.

### III.    Financial Investigation and Forfeiture

*The Moten Affidavits*

13.    On February 11, 2026, government counsel[15] emailed counsel for Moten requesting completion of a financial affidavit and disclosure of assets as required by the plea agreement. Additionally, the government specifically requested information to assist with the recovery of the diamond necklace listed in subsection d of Section 10 of the plea agreement (hereinafter, the "bulldog necklace") entered with Moten. Having received no response within 14 days of the government's request, the government inquired on the status of the requests through the defendant's counsel on three occasions, February 26th, March 12th, and March 18th. On April 2, 2026, the government received a hand-delivered copy of Moten's completed financial affidavit (hereinafter, the "Moten Affidavit"), which is attached as Exhibit E. An accompanying email from counsel informed the government that Moten had made exhaustive efforts to locate the bulldog necklace but, to date, had not located the asset.

14.    The Moten Affidavit listed "0" or "N/A" in nearly every section. Importantly, the Moten Affidavit reported no assets, no financial accounts, and no transfers. Financial investigation revealed the falsity of these claims. For example, records received from PenFed Credit Union indicated that, as recently as October 20, 2025, Moten made transfers from his account with PenFed Credit Union to FanDuel, an online gambling platform. Further, review of records received from CashApp—a mobile payment application—revealed that Moten transferred an

---

[15] These communications were made by government counsel. I have reviewed the communications I relay in this section.

11

aggregate of over $28,839 via CashApp to Wright between January 2024 through January 2025. Additionally, at least two high-value jewelry items possessed by Moten during the course of this investigation were not disclosed in the Moten Affidavit—(1) the Cartier Santos watch seized by the government on November 12, 2025 and appraised for $10,000; and (2) the bulldog necklace.

15.    On April 6, 2026, government counsel emailed counsel for Moten and pointed out the above-referenced omissions in the Moten Affidavit.  On April 8, 2026, counsel for Moten emailed government counsel an updated financial affidavit signed by Moten (hereinafter, the "Moten Updated Affidavit"), which is attached as Exhibit F.  The Moten Updated Affidavit addressed several of the government's cited concerns,[16] with the exception of the bulldog necklace. The affidavit listed a "Diamond necklass" (presumed to be the bulldog necklace) in the Other Assets section (pg. 14), answered "I do not know the location" as to asset location, and provided a purchase price and current value of $300.

16.    Subsequent investigation revealed the falsity of Moten's claims regarding the purchase price of the bulldog necklace.  Specifically, in reviewing electronic data in this case, I uncovered numerous photos and videos of the bulldog necklace.  Notably, I located an Instagram video from August 20, 2024 in which Moten and Whitaker are picking up Moten's bulldog necklace and Whitaker's "Doe" necklace at a Baltimore-area jewelers named "RK Jewelers."[17] Notably, the "Doe" pendant depicted in this video, which was seized on November 12, 2025, was

---

[16] For example, the Moten Updated Affidavit disclosed several financial accounts, with a claimed balance of zero.  The affidavit also provided information on transfers to third parties, although specific amounts were not recalled.

[17] This video is attached as Exhibit G, and was located in a data extraction for one of Moten's devices.

12

appraised on November 21, 2025 for $34,500, and the diamond chain attached to the pendant was appraised at $13,000.

17.     On April 8, 2026, I was party to an email from government counsel to counsel for RK Jewelers in which government counsel inquired as to the approximate value of the bulldog pendant—which was identified by a photograph and the video contained in Exhibit G.  On April 9, 2026, counsel for RK Jewelers responded as follows: "The approximate value of the pendant was $15,000 at the time of purchase, and a piece or two may have been traded in exchange. Further, any additional payments by the buyer were likely made in partial installments."

*The Whitaker Affidavit*

18.     On February 11, 2026, the government emailed[18] counsel for Whitaker requesting completion of a financial affidavit and disclosure of assets as required by the plea agreement.  On February 24, 2026, Whitaker's counsel emailed a completed financial affidavit to the government (hereinafter, the "Whitaker Affidavit"), attached as Exhibit H.  Upon review, the Whitaker Affidavit appeared incomplete and inaccurate in several respects.  For example, Whitaker reported no assets (other than the Mercedes) and no transfers over $5,000 to third parties throughout the course of the conspiracy charged in the criminal Information.  As stated above, in just a single day in September 2025, Whitaker transferred nearly $10,000 to UCC-1 from his NFCU account.  Similar instances of transfers to UCC-1 were apparent on a cursory review of Whitaker's NFCU records.  Additionally, there were numerous instances of inaccurate biographical information.

19.     On February 25, 2026, government counsel provided counsel for Whitaker with a list of concerns/potential inaccuracies with the Whitaker Affidavit, and provided counsel with

---

[18] These communications were made by government counsel.  I have reviewed the email communications I relay in this section.

Whitaker's banking records and multiple relevant videos that indicated the affidavit was inaccurate. The provided videos included: (1) Moten and Whitaker at RK Jewelers, with Whitaker in possession of a large stack of U.S. currency; and (2) Whitaker pulling bulk U.S. currency out of a trash bag and handing it to his mother for her birthday. Some of the government's listed inaccuracies are summarized below:

a) Other Assets Section (pg. 12 of affidavit): The government requested that Whitaker list all assets, even if under a belief the government was aware of those assets. This request specifically referenced jewelry, in particular a "granny boy necklace."

b) Transfers Section (p. 15 of affidavit): The government emphasized that this section relates to *any* funds, and is a request in the aggregate (*i.e.*, structured transactions need to be reported).

*Whitaker Updated Affidavit*

20.     On March 19 and 20, 2026, counsel for Whitaker provided additional information via email, as well as an unsigned updated financial affidavit, attached as Exhibit I. Counsel represented that "the 'granny boy' necklace was lost in early 2025 at an Airbnb in Philadelphia. It was never recovered." Regarding transfers over $5,000, counsel indicated that Whitaker agreed he made significant transfers to UCC-1 that were well over $5,000. Counsel further stated that the "majority" of the transfers were made in order for UCC-1 to place online sporting bets for Whitaker. Additionally, counsel represented that Whitaker made transfers to his mother that would aggregate to over $5,000, and that such transfers were "small monthly amounts, but nothing earmarked for car payments."

21.     On March 20, 2026, counsel for the government emailed Whitaker's counsel requesting that the answers contained within counsel's email should be incorporated into an updated, signed affidavit. Additionally, counsel asked for clarification about the "granny boy" necklace—specifically, whether there was any corroboration that the necklace had been lost. The

14

government also inquired about a "Melly" necklace that was not listed in Whitaker's assets and requested an approximate total for transfers to Whitaker's mother.

22.     On April 7, 2026, counsel for Whitaker reiterated via email that "the necklace in question was lost, and not recovered," providing a value of $9,000. Counsel further represented that Whitaker "never made large transfer amounts to his mother for car down payment [sic] or for any other reason during the time in question." Counsel also stated that a signed, updated financial affidavit would be submitted to the government no later than April 9, 2026. On April 9, 2026, counsel for Whitaker emailed government counsel, stating that he would not "be able to drop off the disclosure form today, and can not go into further detail about why."

*Electronic and Other Evidence Regarding Whitaker's "Granny Boy" Necklace*

23.     Subsequent investigation revealed the falsity of Whitaker's claim (as represented by counsel) that the "granny boy" necklace was lost. While reviewing one of Whitaker's phone extractions, I located a conversation between Whitaker (utilizing his phone ending in -2266) and a contact named "Prince Jewelers." On February 23, 2024, Prince Jewelers sent Whitaker a video depicting a rose-gold pendant covered in small diamonds and five photos believed to be Whitaker's grandmother. At the bottom of the pendant are the words "Granny Boy." Earlier messages depict ongoing discussions about the design of the pendant, as well as payment and completion date.

24.     On November 11, 2025, Prince Jewelers stated: "I was going to get the picture fixed for you. Do you still have that picture." A few hours later, Whitaker responded indicating that he needed to find the picture and was hoping the jeweler still had it. Shortly thereafter, Whitaker sent a picture which matched one of the pictures on the "Granny Boy" pendant depicted in Prince Jewelers' February 2024 message.

25.    Additionally, during my review of Whitaker's jail communications from the Alexandria Adult Detention Center, I located a text message sent from Whitaker to his mother on November 30, 2025, stating, "when you go tell you cum to get my granny boy one tell him I'm locked up you my mova." Whitaker's mother responded, "I know how to handle business stop giving me instructions." On December 13, 2025, a recorded jail call[19] between Whitaker and his mother included a discussion about the logistics of picking up the pendant, to include Whitaker's description of the pendant—*i.e.*, "it's missing the picture of Grandma Evelyn . . . you know it say 'Granny Boy' at the bottom." During this call, Whitaker instructed his mother to ask, "where Prince store," if she got to the location of the jewelers and could not locate the storefront. On December 16, 2025, in a message titled "Pendent," Whitaker's mother stated, "It's not ready it's still at the factory getting fix he will call me when it's ready."

26.    Furthermore, on April 2, 2026, I spoke via phone with a male subject who identified himself as the owner of Prince Jewelers. After providing the owner with a description of the "Granny Boy" pendant, he immediately expressed familiarity with the piece. He informed me that the owner of the pendant had requested a repair for one picture embedded in the necklace, which had come loose. The owner further stated that a male subject dropped off the pendant sometime in October or November 2025 for repairs. The owner recalled that, in December 2025, a female who identified herself as the mother of the owner of the pendant had come into his store and informed him that the owner of the pendant was incarcerated. The owner relinquished the pendant to the same female subject in mid-to-late December 2025.

27.    On April 9, 2026, I had a follow-up telephone call with the aforementioned owner of Prince Jewelers. The owner stated that he had attempted to locate a receipt for the repair of the

---

[19] This jail call is attached as Exhibit J.

16

"Granny Boy" pendant, but no receipt had been generated because the repair was completed free of charge under a lifetime warranty. The owner recalled that he charged approximately $8,500 for the piece.

*Whitaker Second Updated Affidavit*

28.    On April 15, 2026, around 11:50AM, government counsel emailed the government's objections to the presentence report to the Probation Office, counsel for Whitaker, and counsel for Moten. The government's objections incorporated a draft version of the Government's Declaration in Support of Sentencing, which included the above information regarding the government's financial investigation.

29.    On the evening of April 15, 2026, counsel for Whitaker emailed government counsel indicating that an updated financial affidavit signed by Whitaker had been delivered to the U.S. Attorney's Office earlier in the day. This affidavit is attached as Exhibit K. Unlike prior versions of his financial affidavit, this affidavit listed a "Pendant" on page 14, located at "Prince Jewler." On the same date, counsel for Whitaker emailed government counsel and stated that the jeweler still had the "Granny Boy" pendant because it was not picked up in December.

*        *        *

30.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 27, 2026

*Patrick Maxwell*
Patrick Maxwell
Task Force Officer
Drug Enforcement Administration

17